801 S.E.2d 509

**QUICKEN LOANS, INC., Petitioner**

**v.**

**Marsha Gale WALTERS, administratrix FOR Sue WALTERS, Respondent**

No. 16-0298

Supreme Court of Appeals of West Virginia.

Submitted: April 19, 2017

Filed: June 15, 2017

496

Jeffrey J. Bresch, Esq., JONES DAY, Pittsburgh, PA

Carrie Goodwin Fenwick, Esq., GOODWIN & GOODWIN, LLP, Charleston, WV, Counsel for Petitioner

Sarah K. Brown, Esq., Bren Pomponio, Esq., MOUNTAIN STATE JUSTICE, Charleston, WV, Counsel for Respondent

WALKER, Justice:

Following a five-day trial in the Circuit Court of Raleigh County, West Virginia, a jury found that Petitioner Quicken Loans, Inc. ("Quicken Loans") violated the "illegal loan" provision of the West Virginia Residential Mortgage Lender, Broker and Servicer Act, West Virginia Code § 31-17-8(m)(8)[1] in originating a primary mortgage loan for Respondent Sue Walters[2] and was liable to Ms. Walters for damages in the amount of $27,000.00. The jury found in favor of Quicken Loans on Ms. Walters's claim of fraud, and further found that Quicken Loans had not acted with malice.

Significantly, for purposes of this appeal, Ms. Walters had earlier settled her claims against co-defendants Kirk Riffe, an appraiser, and Bank of America N.A. ("BOA"), the

1. The parties variously designate the statute the "illegal loan" statute and the "appraisal statute," and both terms are used in this opinion depending on context.

2. Ms. Walters died during the pendency of this appeal, and this Court granted leave to substitute Marsha Gale Walters, administratrix, as party respondent.

entity that serviced the subject loan, for $75,000.00 and $23,000.00, respectively. Of these amounts, a total of $65,500.00 was designated to be paid to Ms. Walters or on her behalf, and $32,500.00 was designated as payment of attorney fees. In post-trial proceedings, the court below offset the settlement amounts designated to be paid to Ms. Walters against the $27,000.00 in damages awarded by the jury. Subsequently, in considering Ms. Walters's request for an award of attorney fees and costs, the court offset the settlement amounts designated as attorney fees against the fees sought by Ms. Walters's counsel. Thus, in total the court offset only $59,500.00 of the $98,000.00 paid by the settling defendants, against the total damages, costs and fees awarded against Quicken Loans.

In this appeal, Quicken Loans contends that the circuit court erred in allowing the illegal loan claim to go to the jury, arguing that W. Va. Code § 31-17-8(m)(8) applies only where there are two or more mortgages on the property and the aggregate principal amount of the mortgage loans exceeds the property's fair market value. Quicken Loans also contends that the court erred in awarding any attorney fees, arguing that Ms. Walters did not prevail because the jury's verdict was effectively wiped out by application of the offset. Alternatively, Quicken Loans argues that the award of attorney fees cannot be sustained under the principles articulated in this Court's seminal decision in *Aetna Casualty & Surety Co. v. Pitrolo*, 176 W.Va. 190, 342 S.E.2d 156 (1986). Finally, Quicken Loans argues that the court erred in offsetting only a portion of the settlement monies received from appraiser Riffe and BOA against the total compensatory damages received by Ms. Walters, which damages include attorney fees and costs.

After careful review of the parties' briefs and arguments, the Appendix Record, and the applicable law, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the summer of 2007, Ms. Walters called Quicken Loans seeking to refinance the existing mortgage loan on her home in Mabscott, Raleigh County, West Virginia. Ms. Walters, who was responding to a Quicken Loans advertisement, was interested in obtaining a lower interest rate and a lower mortgage payment.

On September 14, 2007, Quicken Loans originated a fixed-rate, 30-year mortgage loan in the amount of $136,000.00. As part of the loan approval process, Quicken Loans had contacted Title Source Inc., an entity described by Quicken Loans as "a related but independent company," which in turn contracted with Kirk Riffe, a licensed appraiser. In performing the appraisal, Mr. Riffe compared Ms. Walters's Mabscott home to properties in the Woodlawn neighborhood of Beckley, concluding that the home was worth $152,000.00. In fact, evidence at trial indicated that the fair market value of the property in September, 2007, was $64,000.00, and that Mr. Riffe's appraisal methodology was fatally flawed.

As of the date of closing of the Quicken Loans loan, no other mortgage loans existed on Ms. Walters's home; the purpose of the loan was to refinance her existing mortgage obligation, i.e., to pay off the existing mortgage loan and replace it with a loan carrying a lower rate of interest.

Immediately after originating the loan, Quicken Loans sold it to Countrywide Financial, which in turn sold it to BOA. Ms. Walters made regular payments on the loan for approximately twenty months, after which she found herself in financial difficulty and attempted, unsuccessfully, to work out a modification with BOA.

Thereafter, in December, 2011, Ms. Walters filed a lawsuit against Quicken Loans, Riffe and BOA, asserting three claims against Quicken Loans (unconscionable inducement, illegal loan, and fraud), two against Riffe (negligence and acceptance of a fee contingent on a predetermined conclusion), and one against BOA (illegal debt collection practice). In its answer, Quicken Loans admitted certain allegations, including, of relevance to this appeal, the principal amount of the loan. Further, Quicken Loans

asserted affirmative defenses, including, of relevance to this appeal, that it had made the loan to Ms. Walters on reliance upon a bona fide written appraisal of the property made by Kirk Riffe, an independent third-party appraiser duly licensed or certified by the West Virginia Real Estate Appraiser Licensing and Certification Board, and prepared in compliance with the uniform standards of professional appraisal practice. Finally, Quicken Loans filed a motion for judgment on the pleadings, arguing that Ms. Walters's illegal loan claim failed as a matter of law because the statute on which the claim was based, West Virginia Code § 31-17-8(m)(8), applies only where there are two or more mortgages on the property whose *aggregate* total exceeds the property's fair market value.

The case was hotly contested for more than three years. The docket sheet for the litigation evidences voluminous written discovery, multiple dispositive motions, motions *in limine*, multiple hearings on motions, several court-led mediations, a motion to exclude "pattern and practice" witnesses and an evidentiary hearing on the motion, and the like. Ultimately, as noted above, Ms. Walters settled with Mr. Riffe and BOA and dismissed her claim against Quicken Loans for unconscionable inducement, deeming it duplicative. On March 2, 2015, Ms. Walters's case against Quicken Loans proceeded to trial on the two remaining claims (illegal loan, and fraud), resulting in a finding for Ms. Walters on the illegal loan claim, a finding for Quicken Loans on the fraud claim, and a finding that Quicken Loans had not acted with malice. As noted, the jury awarded Ms. Walters $27,000.00 in compensatory damages. In light of its finding on the fraud claim, the jury did not address the issue of punitive damages.

In post-trial proceedings, Quicken Loans filed a motion to correct the verdict pursuant to Rule 60(a) of the West Virginia Rules of Civil Procedure, requesting that the circuit court apply an offset of the Riffe/BOA settlement monies as follows: $27,000.00 to be offset against the jury's award of damages, and the remaining $71,000.00 to be offset against

any attorney fees that might be awarded to Ms. Walters's counsel. Ms. Walters, in turn, filed a petition for an award of attorney fees, seeking $180,312.55 in fees and costs for 675 hours of work. After requiring Ms. Walters's attorneys to refine their billing entries, in order to allow the court to better distinguish work done and costs incurred on claims against settling defendants and claims in which Ms. Walters did not prevail, and following a hearing on both outstanding motions, the court below ruled that Ms. Walters had "suffered a single indivisible loss arising from the combined actions of Defendant Quicken Loans and the settling co-defendants, Bank of America and Kirk Riffe ... [and therefore] Defendant Quicken Loans is entitled to an offset as a matter of law"; and Ms. Walters prevailed on her claim based on a violation of the appraisal statute "regardless of the dollar amount of damages actually awarded...," and therefore was entitled to an award of attorneys' fees and costs.

The court applied the offset not as Quicken Loans had requested but as follows: (1) the portion of the combined Riffe/BOA settlements payable to Ms. Walters or on her behalf ($65,500.00)[3] was offset against the damages awarded by the jury against Quicken Loans, effectively wiping out the jury award; and (2) the portion of the settlements designated as attorney fees ($32,500.00) was offset against the fees and costs sought from Quicken Loans. The total amount of the fees and costs awarded to Ms. Walters's attorneys by the court, after application of the offset, was $156,653.38.

## II. STANDARD OF REVIEW

■ It is well established in this Court's jurisprudence that "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.L. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

With respect to our review of an award of costs and damages, we have held that:

---

**3.** The $50,000.00 attributed as damages in the Riffe settlement was not paid directly to Ms.

Walters; rather, it was paid to reduce the balance of her outstanding mortgage indebtedness.

"[T]he trial [court] ... is vested with a wide discretion in determining the amount of ... court costs and counsel fees; and the trial [court's] ... determination of such matters will not be disturbed upon appeal to this Court unless it clearly appears that [it] has abused [its] discretion." Syl. Pt. 3, in part, *Bond v. Bond*, 144 W.Va. 478, 109 S.E.2d 16 (1959).

Syl. Pt. 1, *Heldreth v. Rahimian*, 219 W.Va. 462, 637 S.E.2d 359 (2006).

## III. DISCUSSION

### A. *Applicability of West Virginia Code § 31-17-8(m)(8)*

The first issue we consider is whether West Virginia Code § 31-17-8(m)(8) applies where, as here, the mortgage at issue is the sole mortgage on the subject property. Quicken Loans contends that by its express terms, West Virginia Code § 31-17-8(m)(8) applies only where there are two or more mortgages on the property and the aggregate principal amount of the mortgage loans exceeds the property's fair market value. In furtherance of its position, Quicken Loans presents the relevant portion of the statute as follows:

> In making any primary or subordinate mortgage loan, no licensee may, and no primary or subordinate mortgage lending transaction may, contain terms which: ... (8) Secure a primary or subordinate mortgage loan in a principal amount that, **when added to the aggregate total of the outstanding principal balances of all other primary or subordinate mortgage loans secured by the same property, exceeds the fair market value of the property** on the date that the latest mortgage loan is made. ... (Emphasis in Quicken Loans brief)

In reliance on the longstanding rule of statutory construction "that significance and effect must, if possible, be given to every section, clause, word or part of the statute," Syl. Pt. 3, in part, *Meadows v. Wal-Mart Stores, Inc.*, 207 W.Va. 203, 530 S.E.2d 676 (1999), Quicken Loans argues that under the clear and unambiguous terms of the emphasized language, a single mortgage loan, even one in a principal amount that exceeds the property's fair market value, does not fall within the statutory prohibition. Quicken Loans points out that in *Skibbe v. Accredited Home Lenders, Inc.*, No. 2:08-cv-01393, 2014 WL 2117088 at *6 (S.D. W. Va. May 21, 2014), the United States District Court for the Southern District of West Virginia so held, and that this Court should find Judge Goodwin's opinion to be persuasive, if not dispositive.[4]

In contrast, Ms. Walters contends that by its express terms, West Virginia Code § 31-17-8(m)(8) applies to any primary or secondary loan whose principal amount exceeds the property's fair market value. In furtherance of her position, Ms. Walters presents the relevant portion of the statute in her brief as follows:

> In making any **primary** or subordinate mortgage loan, no licensee may, and no **primary** or subordinate mortgage lending transaction may, contain terms which: ... (8) Secure a **primary** or subordinate mortgage loan in a principal amount that, when added to the aggregate total of the outstanding principal balances of all other **primary** or subordinate mortgage loans secured by the same property, exceeds the fair market value of the property on the date that the latest mortgage loan is made. ... (Emphasis in Ms. Walters's brief)

In reliance on the same rule of statutory construction as set forth above, Ms. Walters argues that literal application of the "aggregate total" language would effectively eliminate all primary loans, including consolidation loans, from the statute's ambit, as only secondary loans are defined under the Act as those "... subject to the lien of one or more prior recorded mortgages or deeds of trust." W. Va. Code § 31-17-1(*o*). Ms. Walters further suggests that in this case the "aggregate total of the outstanding principal balances of all other primary or subordinate mortgage loans...," equals zero, an attempt to finesse

---

4. *See State ex rel. Johnson & Johnson Corp. v. Karl*, 220 W.Va. 463, 477 n. 18, 647 S.E.2d 899, 913 n. 18 (2007) ("While federal court opinions applying West Virginia law are often viewed persuasively, we are not bound by those opinions.").

Quicken Loans's argument by focusing solely on the amount of total indebtedness, not the number of mortgages on the property.

In short, we are presented with an interesting situation in which both parties contend that West Virginia Code § 31-17-8(m)(8) is clear and unambiguous—and then reasonably argue, utilizing the same rule of statutory construction, that the statutory provision has two entirely irreconcilable clear and unambiguous meanings. On this basis alone it might be tempting for this Court to conclude that the statute is ambiguous, but our precedents counsel against a rush to such conclusion. *See Habursky v. Recht*, 180 W.Va. 128, 132, 375 S.E.2d 760, 764 (1988) (disagreement among the parties "as to the meaning or the applicability of [a statutory] provision does not of itself render [the] provision ambiguous or of doubtful, uncertain or obscure meaning.") (internal quotations and citations omitted); *see also T. Weston, Inc. v. Mineral Cty.*, 219 W.Va. 564, 568, 638 S.E.2d 167, 171 (2006) ("[t]he fact that parties disagree about the meaning of a statute does not itself create ambiguity or obscure meaning.") (internal citations omitted). Rather, we will look beyond the parties' arguments, and their laser focus on a single rule of statutory construction, in order to determine whether our precedents provide a path to a more enlightened analysis.

As a threshold matter, we reject Ms. Walters's claim that this issue was resolved in *Quicken Loans v. Brown*, 230 W.Va. 306, 737 S.E.2d 640 (2012) (*Quicken Loans I*), either directly or *sub silentio*. Although one count of the complaint in *Quicken Loans I* alleged a violation of West Virginia Code § 31-17-8(m)(8) in the origination of a primary loan—a consolidation loan, as in the instant case—the trial court's ruling that the statute applied to a single primary loan was not challenged on appeal. Rather, the illegal loan count was raised on appeal only in the context of whether the lower court erred in finding that a negligent violation of the statute supported the remedy of cancellation of the loan.[5] *Quicken Loans I*, 230 W.Va. at 325-26, 737 S.E.2d at 659-60. We found this

ruling to be error. The remainder of the *Quicken Loans I* decision dealt with issues involving attorney fees and punitive damages, all arising from the court's findings that Quicken Loans was liable for common law fraud and various claims under the West Virginia Consumer Credit and Protection Act, West Virginia Code §§ 46A-1-1 through 8-102. Thus, whether the appraisal statute applied to a single primary loan was neither raised in the appeal nor material to its disposition.

Similarly, we reject Quicken Loans's urging that we treat Judge Goodwin's ruling in *Skibbe* as persuasive authority. Judge Goodwin held that "[by] its terms, the statute does not apply when a borrower takes out her first mortgage loan and the principal balance of that loan exceeds the fair market value of the property at the time the loan is made. ..." *Skibbe*, 2014 WL 2117088, at *6. However, the district court provided no analysis to support his reasoning, and cited no precedents or other authority upon which he had relied, and we do not find a bald conclusion to be persuasive.

■ As this Court has instructed on many occasions, " '[t]he primary rule of statutory construction is to ascertain and give effect to the intention of the Legislature.' Syl. Pt. 8, *Vest v. Cobb*, 138 W.Va. 660, 76 S.E.2d 885 (1953)." Syl. Pt. 1, *Sheena H. for Russell H. v. Amfire, LLC*, 235 W.Va. 132, 772 S.E.2d 317 (2015). More specifically, and of particular relevance to this case, we have held that " '[w]here a particular construction of a statute would result in an absurdity, some other reasonable construction, which will not produce such absurdity, will be made.' Syl. Pt. 2, *Newhart v. Pennybacker*, 120 W.Va. 774, 200 S.E. 350 (1938)." Syl. Pt. 3, *Sheena H.*

West Virginia Code § 31-17-8(m)(8) is contained in Article 17, Section 8 of the WEST VIRGINIA RESIDENTIAL MORTGAGE LENDER, BROKER AND SERVICER ACT. W. Va. Code §§ 31-17-1 through -20 (2015). Article 17, Section 8 is entitled **Maximum interest rate on subordinate loans; prepayment rebate; maximum points, fees**

---

**5.** As in the instant case, in *Quicken Loans I* Quicken Loans's violation of W. Va. Code § 31-17-8(m)(8) had been found to be negligent, not willful.

and charges; overriding of federal limitations; limitations on lien documents; prohibitions on primary and subordinate mortgage loans; civil remedy; and consistent with the tenor of this title language, all of the Section 8 provisions fall within one or both of two categories, *restrictions* on mortgage lenders, brokers and servicers, and *protections* for borrowers. W.Va. Code §§ 31-17-8. Section 8(m)(8) falls within the former category: it is a restriction on a lender's ability to extend either a primary or subordinate loan which, in lay terms, puts the borrower "underwater" on his or her mortgage indebtedness. The Legislature enumerated only two defenses to this statutory restriction, both very specific. The first exception provides that

> [f]or purposes of this paragraph [§ 8(m)(8)], a broker or lender may rely upon a bona fide written appraisal of the property made by an independent third-party appraiser, duly licensed or certified by the West Virginia Real Estate Appraiser Licensing and Certification Board and prepared in compliance with the uniform standards of professional appraisal practice.

W.Va. Code § 31-17-8(m)(8). Pursuant to this statutory exception, Quicken Loans asserted as an affirmative defense that it had relied on a bona fide written appraisal made by an independent third-party appraiser, a claim the jury necessarily rejected.

The second exception was set forth in the statute as modified in the 2012 Regular Session of the West Virginia Legislature, and provides that

> commencing January 1, 2012, and continuing until January 1, 2015, this prohibition does not apply to any mortgage modification or refinancing loan made in participation with and in compliance with the federal Homes Affordable Modification Program, a part of the federal Making Home Affordable program, or any other mortgage modification or refinancing loan funded through any other federal

or state program or litigation settlement. . . .

W.Va. Code § 31-17-8(m)(8).[6] It is beyond dispute that this exception does not apply to Ms. Walters's loan, which was originated by Quicken Loans in 2007.

In short, Chapter 31, Article 17, Section 8 of the West Virginia Code as a whole, and § 31-17-8(m)(8) in particular, evidence a legislative intent to protect West Virginia homeowners from predatory lending in its various forms. The prohibition contained in the appraisal statute is broad and the exceptions are narrowly drawn. We cannot find, and indeed cannot envision, any basis for concluding that the Legislature intended the statutory prohibition to extend only to second or subsequent loans where, as here, it specifically included primary loans within the statute's ambit. In this regard, primary and subordinate mortgage loans are defined in West Virginia Code §§ 31-17-1(m) & (o) respectively:

> (m) "Primary mortgage loan" means any loan primarily for personal, family or household use that is secured by a mortgage, deed of trust or other equivalent consensual security interest on a dwelling as defined in Section 103(w) of the Truth in Lending Act or residential real estate upon which is constructed or intended to be constructed a dwelling.
>
> * * *
>
> (o) "Subordinate mortgage loan" means any loan primarily for personal, family or household use that is secured by a mortgage, deed of trust or other equivalent consensual security interest on a dwelling as defined in Section 103(w) of the Truth in Lending Act or residential real estate upon which is constructed or intended to be constructed a dwelling *and is subject to the lien of one or more prior recorded mortgages or deeds of trust.*

W.Va. Code §§ 31-17-1(m) and (o) (emphasis added).

It is readily apparent that if, as Quicken Loans contends, the appraisal statute applies

---

**6.** In Acts 2016, c. 157, the Legislature rewrote the proviso to delete the discrete time frame, which had expired.

only to loans "... in a principal amount that, when added to the aggregate total of the outstanding principal balances of all other primary or subordinate mortgage loans ... exceeds the fair market value of the property...," then the statute applies *only* to subordinate mortgage loans, since by definition *only* subordinate mortgage loans are "subject to the lien of one or more prior recorded mortgages or deeds of trust." This would be an absurd result, as the statute expressly states, multiple times, that it applies, *inter alia*, to primary mortgage loans and primary mortgage loan transactions.

As noted above, " '[w]here a particular construction of a statute would result in an absurdity, some other reasonable construction, which will not produce such absurdity, will be made.' Syl. Pt. 2, *Newhart v. Pennybacker*, 120 W.Va. 774, 200 S.E. 350 (1938)." Syl. Pt. 3, *Sheena H.*

▪ Accordingly, we hold that the provisions of West Virginia Code § 31-17-8(m)(8) apply to any primary or subordinate mortgage loan that exceeds the fair market value of the property at the time the loan is made, either singly, in the case of a first or consolidation mortgage loan, or in combination with any outstanding balances of any other existing loans.

### B. Award of Attorney fees and Costs

▪ The second issue presented for resolution is whether the trial court erred in finding Ms. Walters to be a prevailing party and awarding her $156,653.38 in attorney fees and costs. In this regard, we reiterate our longstanding rule that " '[T]he trial [court] ... is vested with a wide discretion in determining the amount of ... court costs and counsel fees; and the trial [court's] ... determination of such matters will not be disturbed upon appeal to this Court unless it

clearly appears that [it] has abused [its] discretion.' Syl. Pt. 3, in part, *Bond v. Bond*, 144 W.Va. 478, 109 S.E.2d 16 (1959)." Syl. Pt. 1, *Heldreth v. Rahimian*, 219 W.Va. 462, 637 S.E.2d 359 (2006). *See also Vanderbilt Mortg. and Fin., Inc. v. Cole*, 230 W.Va. 505, 515, 740 S.E.2d 562, 573 (2013) ("The controlling law places the decision of whether to award attorney fees squarely within the discretion of the circuit court.").

Quicken Loans contends that Ms. Walters did not substantially prevail at trial because (1) the jury found in her favor on only one of her two claims[7] and found that Quicken Loans had not acted with malice;[8] (2) the amount of damages awarded by the jury, $27,000.00, was far less than the amount sought by her counsel in closing argument;[9] and (3) the entire amount of the jury's award was offset by her earlier settlements with appraiser Riffe and Bank of America, thus "result[ing] in no success, no additional monies, and no benefit to Walters," in Quicken Loans's view. In the alternative, Quicken Loans argues that in determining the amount of fees and costs to be awarded, the trial court failed to do a proper analysis utilizing the factors enumerated in our seminal decision in *Aetna Casualty & Surety Co. v. Pitrolo*, 176 W.Va. 190, 342 S.E.2d 156 (1986). Additionally, Quicken Loans contends that the court erred in failing to offset the *entire* amount of Ms. Walters's settlements with appraiser Riffe and BOA against the *entire* amount of Ms. Walters's combined compensatory award, including attorney fees and costs, thus depriving Quicken Loans of the benefit of $38,500.00 of the offset to which it was entitled.

In response, Ms. Walters argues that pursuant to West Virginia Code § 31-17-17(c), a violation of the appraisal statute entitles the borrower to file an action for damages, rea-

---

7. In her complaint, Ms. Walters asserted three claims against Quicken Loans: unconscionable inducement, illegal loan, and fraud. Ms. Walters dismissed the first claim prior to trial, believing it to be duplicative, and thereafter the jury found in her favor on the illegal loan claim and in Quicken Loans's favor on the fraud claim.

8. As we held in *Quicken Loans I*, 230 W.Va. at 325-26, 737 S.E.2d at 659-60, a finding of malice was a condition precedent for Ms. Walters to

seek the remedy of cancellation of the principal amount of the loan.

9. In his closing argument, counsel did not suggest any specific amount of compensatory damages, focusing instead on the punitive damages sought—all of which became moot when the jury found in favor of Quicken Loans on the fraud claim.

sonable attorneys' fees and costs, and that the statute "does not dictate any level of success necessary for the consumer to recover attorney's fees ...," although the result obtained in litigation is one factor to be considered. *Quicken Loans v. Brown*, 236 W.Va. 12, 30, 777 S.E.2d 581, 599 (2014) (*Quicken Loans II*). Further, Ms. Walters argues that "[b]ecause attorney's fees themselves are a measure of compensatory damages, Mrs. Walters's total damages award is not the $27,000.00 awarded by the jury, but the jury's award of actual damages combined with the court's award of attorneys (sic) fees for a total of $183,653.38—a sum which is not entirely offset by Mrs. Walters's earlier settlements." As to the reasonableness of the fee award, Ms. Walters argues that the trial court did a thorough *Pitrolo* analysis and that the court's actions were well within the broad ambit of its discretion. Finally, Ms. Walters argues that the trial court correctly handled the offset because claim against Quicken Loans giving rise to the award of fees and costs was "wholly separate and divisible" from the claims asserted against either appraiser Riffe or BOA.

We begin our discussion with West Virginia Code § 31-17-17(c), which provides that "[a]ny residential mortgage loan transaction in violation of this article shall be subject to an action, which may be brought in a circuit court having jurisdiction, by the borrower seeking *damages, reasonable attorneys fees and costs*." (Emphasis added). As we explained in *Heldreth*, a case involving the fee-shifting provision in the West Virginia Human Rights Act, West Virginia Code § 5-11-13(c) (1998), such provisions provide "the economic incentive ... to attract competent counsel for the purpose of enforcing ... laws that serve to protect the interests of this state's citizenry." *Heldreth*, 219 W.Va. at 467, 637 S.E.2d at 364 While acknowledging this general principle, Quicken Loans argues that fee shifting statutes come into play only where the fee applicant "was the prevailing party at trial, and for a party to 'prevail' at trial, he need not show success on every claim brought but he must demonstrate significant success on a significant claim." *Schartiger v. Land Use Corp.* 187 W.Va. 612, 616, 420 S.E.2d 883, 887 (1991). In this case,

Quicken Loans claims, Ms. Walters cannot meet the *Schartiger* test because she succeeded on only one of the two causes of action that went to the jury; because the amount of the jury's damages award was only slightly more than the amount Quicken Loans had previously offered in settlement; and because the damages award was totally offset by the Riffe/BOA settlements, effectively leaving Ms. Walter with nothing but a "hollow victory" on a "minor claim."

We disagree. First, as we observed in *Vanderbilt Mortgage & Finance, Inc. v. Cole*, 230 W.Va. 505, 516, 740 S.E.2d 562, 573 (2013), in construing the West Virginia Consumer Credit and Protection Act, "[n]either the [statute] nor our case law requires that [plaintiff] prevail on the majority of her claims in order to receive attorney fees." Additionally, although Quicken Loans recites the standard set forth in *Schartiger*, it completely ignores the Court's further explanation that "the trial court is to examine all of the facts as they relate to the 'prevailing party' standard. The most pertinent of these facts are those relating to settlement offers. ..." 187 W.Va. at 616, 420 S.E.2d at 887. The *Schartiger* court continued:

The fee-shifting rules adopted by the legislature in the statute under consideration and enforced by this court are meant to cover two extreme cases as well as all of the cases in between. If a tort-feasor approaches his victim immediately after the tort and makes a reasonable offer that includes reasonable attorneys' fees up to the time of the offer, only to be rebuffed by a greedy victim or victim's lawyer, and the jury awards less than the tort-feasor originally offered for damages alone, then it would be an abuse of discretion for the trial court to award attorneys' fees to the plaintiff.

On the other hand, if the tort-feasor chases down the plaintiff on the courthouse steps minutes before trial only to make an offer that might minimally cover the plaintiff's damages, but that would not cover plaintiff's attorneys' fees expended to that point, and the jury awards damages roughly equivalent to the tortfeasor's offer, then it would be an abuse of discretion for the

trial *not* to award attorneys' fees to the plaintiff.

Most cases do not fit either of these extremes but fall somewhere in between. *Id.,* 187 W.Va. at 617, 420 S.E.2d at 888 (emphasis in original).

In reviewing the record in this case, we conclude that the circumstances herein are far closer to the second extreme example cited in *Schartiger* than to the first. This case was litigated for more than three years, and the circuit court's docket sheet contains 467 entries evidencing multiple pleadings, requests for discovery, briefs, responses and motions, as well as numerous depositions and hearings, and several court-led mediation sessions. Ms. Walters represents that Quicken Loans's sole offer of $25,000.00 was made approximately one week before trial commenced.[10] Pursuant to *Schartiger,* this offer cannot be deemed "reasonable" since, although it could be said to "minimally cover the plaintiff's damages...," it did not cover any fees and expenses incurred over the three-year course of the litigation, and the jury-awarded more in damages than Quicken Loans had offered to pay, albeit not much more. *See Rice v. Mike Ferrell Ford,* 184 W.Va. 757, 762 n.7, 403 S.E.2d 774, 779 n.7 (1991) (recognizing that "as a practical matter," in many situations the amount of damages awarded on a statutory claim will be so small that few attorneys will pursue a client's case with diligence unless the amount of the fee is proportional to the work required, rather than to the amount involved).

But wait, says Quicken Loans, not only did Ms. Walters prevail on just one claim, but also the jury's award of damages was completely offset by the prior settlements with appraiser Riffe and BOA, meaning that Ms. Walters effectively received nothing. Again, we disagree. Ms. Walters's claim pursuant to the illegal loan provision of the West Virginia Residential Mortgage Lender, Broker and Servicer Act, West Virginia Code § 31-17-8(m)(8) was not a "minor claim"; Quicken Loans's actions in originating a loan that far exceeded the fair market value of Ms. Wal-

ters's home *violated the law.* And Ms. Walters's victory was not a "hollow" one, as the jury's verdict not only awarded her damages but also gave rise to her claim for payment of costs and attorney fees—a sum that in its totality exceeds the amount of the Riffe/BOA settlements.

In consideration of all of these facts and circumstances, and acknowledging the trial court's familiarity with all of the "ins and outs" of this litigation, we cannot conclude that the court abused its discretion in finding that Ms. Walters was a prevailing party.

 Next, Quicken Loans argues that the court did not do a full and fair analysis of Ms. Walters's fee petition as required under Syllabus Point 4 of *Aetna Casualty & Surety Co. v. Pitrolo,* 176 W.Va. 190, 342 S.E.2d 156 (1986):

Where attorney's fees are sought against a third party, the test of what should be considered a reasonable fee is determined not solely by the fee arrangement between the attorney and his client. The reasonableness of attorney's fees is generally based on broader factors such as: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Syl. Pt. 4, *Pitrolo.* Quicken Loans further argues that the court did not make adequate findings and conclusions with respect to the propriety of the requested fees and costs, a condition precedent to meaningful appellate review.

---

10. Quicken Loans stated in proceedings before the trial court that it had "offered to settle" the case some months before the trial, but did not clarify whether this was simply an expression of general willingness or a concrete monetary offer.

Specifically, Quicken Loans complains that while the court held a *Pitrolo* hearing, it was not an evidentiary hearing, as Quicken Loans had requested; therefore Quicken Loans did not have an opportunity to contest the evidence submitted by Ms. Walters's counsel in support of the petition for costs and fees, and as a result many of the court's findings were based on incomplete evidence. In this regard, we do not understand Quicken Loans to be claiming that the rates charged by the attorneys and paralegals were unreasonable, that the work claimed wasn't actually performed, or that the hours in the time records were inflated.[11] Rather, Quicken Loans's attack on the time records submitted by Ms. Walters's counsel is that most of the time reflected in the records was incurred in the proceedings against Kirk Riffe and Bank of America, or incurred in pursuing the fraud claim on which Quicken Loans prevailed.

This Court has held that in order for a court to determine the reasonableness of a fee request, "... it must allow the parties to present evidence on their own behalf *and to test their opponents' evidence by cross-examination*, 'the greatest legal engine ever invented for the discovery of truth[.]' " *Multiplex, Inc. v. Town of Clay*, 231 W.Va. 728, 738, 749 S.E.2d 621, 631 (2013) (emphasis supplied and citations omitted). *Cf. In Re: John T., Michael T., Natalie T. and Clare T.*, 225 W.Va. 638, 645, 695 S.E.2d 868, 875 (2010) (case remanded to the circuit court to permit the parties to present evidence regarding costs and attorney fees); *Daily Gazette Co. v. Canady*, 175 W.Va. 249, 251, 332 S.E.2d 262, 332S.E.2d 262, 264 (1985) (award of attorney fees requires notice and an opportunity to be heard).

We believe that this language in *Multiplex*, although not encompassed in a syllabus point, compels the conclusion that Quicken Loans was entitled to the evidentiary hearing

it sought, and that the court erred in refusing to allow it. Although it is not readily apparent what factual evidence could be presented to rebut Ms. Walters's attorneys' fee records and affidavits, it is not for this Court to second-guess Quicken Loans's assertion that it was entitled, at the least, to test the records and affidavits through cross-examination.[12]

In light of our holding that this case must be remanded for an evidentiary hearing, we need not address Quicken Loans's claims that certain of the trial court's *Pitrolo* findings were factually unsupportable and/or based solely on Ms. Walters's evidence without consideration of Quicken Loans's evidence. However, inasmuch as the issue of offset will necessarily arise again on remand, we proceed to address the manner in which the trial court handled offset of the Riffe/BOA settlements.

In *Quicken Loans I*, 230 W.Va. at 332, 737 S.E.2d at 666, we wrote that "in general, fee-shifting statutes are compensatory and not punitive in nature...," for purposes of determining a compensatory-to-punitive damages ratio. Thereafter, in *Quicken Loans, Inc. v. Brown*, 236 W.Va. 12, 777 S.E.2d 581 (2014) (*Quicken Loans II*), at syllabus point 3, we extended the reasoning underpinning *Quicken Loans I* and held that "[a]ttorney fees and costs awarded under West Virginia Code § 46A-5-104 (1994) of the West Virginia Consumer Credit and Protection Act are compensatory in nature and shall be subject to offset by the amount of any good faith settlements previously made with the plaintiff by other jointly liable parties." In our discussion of this issue, we cited our earlier holding in syllabus point 1 of *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996) that "[d]efendants in a civil action against whom awards of compensatory and punitive dam-

11. It should be noted that the time records submitted by Ms. Walters's attorneys were prepared contemporaneously, not after the fact.

12. We are troubled by Quicken Loans's counsel's statement, at the outset of his argument at the *Pitrolo* hearing held on October 8, 2015, that "I think that I can be perhaps uncharacteristically brief with you this morning. I think that the papers that we had presented before you do a

very nice job of squarely putting the matter before you." This language could be construed as an acknowledgement by Quicken Loans that the court could properly decide the fee issues without anything more than the information contained in the parties' written submissions. However, we do not read counsel's statement as a waiver of Quicken Loans's right to raise the evidentiary hearing issue on appeal.

ages are rendered are entitled to a reduction of the compensatory damages award, but not the punitive damage award, by the amount of any good faith settlements previously made with the plaintiff by other jointly liable parties." *Quicken Loans II*, 236 W.Va. at 44, 777 S.E.2d at 613. In this latter regard, the trial court, which had a birds-eye view of the entirety of this litigation, specifically found in its Order Granting Defendant Quicken Loans, Inc.'s Motion to Correct the Verdict that "the plaintiff suffered a single indivisible loss arising from the combined actions of Defendant Quicken Loans and the settling co-defendants, Bank of America and Kirk Riffe. ...," and further that "because all of plaintiff's damages flowed from the actions undertaken by all three (3) defendants herein, Defendant Quicken Loans is entitled to an offset as a matter of law." Ms. Walters has not assigned error to these rulings.

■ We believe our decision in *Quicken Loans II*, although specifically limited by its terms to fees and costs sought pursuant to W. Va. Code § 46A-5-104, was grounded in law and logic that extend to the instant case, where Ms. Walters seeks an award of fees and costs under West Virginia Code § 31-17-17(c), another fee-shifting statute, for successfully prosecuting her claim against Quicken Loans under the appraisal statute, West Virginia Code § 31-17-8(m)(8). Accordingly, we hold that attorney fees and costs awarded under West Virginia Code § 31-17-17(c) are compensatory in nature and shall be subject to offset by the amount of any good faith settlements previously made with the plaintiff by other jointly liable parties.

We turn now to the application of our holding to the facts of this case, and conclude that the trial court erred in awarding only a partial offset of the Riffe/BOA settlement monies. The court fashioned what appears to be some sort of apples-to-apples methodology, offsetting the jury's damages award by that portion of settlements payable to the plaintiff or on her behalf, and offsetting the attorney fees award by that portion of the settlements payable to the attorneys—with the end result that Quicken Loans did not receive the offset benefit of $38,500.00 of the prior settlements. We can find nothing in the law to support this approach, as more than thirty years ago the Supreme Court of the United States held that an attorney fee award belongs to the client, not the attorney. *Evans v. Jeff D.*, 475 U.S. 717, 730-31 & n.19, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). *See also Heldreth*, 219 W.Va. at 471, 637 S.E.2d at 368 ("the fee-shifting statute at issue contemplates that the fee award belongs to the successful complainant."); *Farley v. Zapata Coal Corp.*, 167 W.Va. 630, 639, 281 S.E.2d 238, 244 (1981) (purpose of a fee shifting statute is to make the plaintiff whole). This is entirely consistent with our cases holding that an award of attorney fees and costs, where appropriate, is an element of compensatory damages for a prevailing party; the character of the award does not change depending on who cashes the check, which seems to have been an underlying assumption of the trial court in the instant case.

The correct procedure to be employed on remand, after an evidentiary hearing, is three-fold. First, the court will analyze Ms. Walters's costs and fees submission, in light of the parties' arguments and any evidence presented, to determine which entries cannot be fairly attributed to Ms. Walters's success on her illegal loan claim. In this regard, we acknowledge that the trial court did make findings as to the number of hours attributable solely to the claims against appraiser Riffe and solely to the claim against BOA;[13] however, the court made no findings as to the number of hours, if any, attributable solely to the fraud claim against Quicken Loans, on which Quicken Loans prevailed. Our case law requires this analysis. "The calculation of attorney's fees in a human rights action requires, as this Court has previously recognized, the exclusion of hours spent on unsuccessful claims." *Heldreth*, 219 W.Va. at 467, 637 S.E.2d at 364. *See also* Syl. Pt. 5, in part, *W. Va. Highlands Conservancy, Inc. v. W. Va. Div. of Envtl. Prot.*, 193

---

13. In its order awarding fees and costs, the trial court concluded that 45.2 hours set forth in Ms. Walters's fee petition was attributed to matters related exclusively to appraiser Riffe, and 25.9 hours to matters related exclusively to Bank of America. These figures may or may not change after the court hears the evidence Quicken Loans wishes to present.

W.Va. 650, 458 S.E.2d 88 (1995) ("Apportionment of attorney's fees is appropriate where some of the claims and efforts of the claimant were unsuccessful."). Second, the court will deduct these hours from the total hours, to arrive at the number of hours of work on which a fee award may properly be based. Third, the court will then offset the total amount of the prior settlements, $98,000.00, against the total compensatory damages, i.e., the sum of the jury's award of damages and the court' award of costs and fees.

### IV. CONCLUSION

We affirm the trial court's ruling with respect to the applicability of West Virginia Code § 31-17-8(m)(8) to a single primary mortgage loan, and affirm the court's ruling that Ms. Walters was a prevailing party and is thus entitled to an award of fees and costs. However, we reverse the court's award of fees and costs and remand this case for an evidentiary hearing, after which the court will reconsider its *Pitrolo* findings on the basis of all the evidence presented by the parties, determine an appropriate award of fees and costs, and thereafter offset the entire amount of the prior settlements against the entirety of Ms. Walters's compensatory damages, which include both the jury's award of damages and the court's award of fees and costs.

Affirmed in part; reversed in part; and remanded.

CHIEF JUSTICE LOUGHRY dissents and reserves the right to file a dissenting opinion.

JUSTICE KETCHUM dissents and reserves the right to file a dissenting opinion.

LOUGHRY, C.J., dissenting, joined by KETCHUM, J.:

The majority's illogical and legally unsound opinion takes a perfectly straightforward statute and, despite declaring it to be unambiguous, badly misconstrues it, making a perfectly lawful banking transaction illegal. West Virginia Code § 31-17-8(m)(8) prohibits *only* the predatory practice of making loans which on their face appear to be adequately collateralized, but actually exceed the secur-

ing property's fair market value when aggregated with other loans. In no way does the statute prohibit making loans which exceed 100 percent "loan-to-value"; nevertheless, the majority now prohibits this otherwise lawful practice and compounds this error by awarding respondent Walters (the "respondent") with attorney's fees for prosecuting a claim that garnered her nothing. Because this Court is neither empowered to *sua sponte* create regulatory banking legislation nor sits as an arbiter of "moral" victories, I respectfully dissent.

### I. Inapplicability of West Virginia Code § 31-17-8(m)(8)

The respondent refinanced her existing mortgage with the petitioner, Quicken Loans, Inc. (the "petitioner") in the amount of $136,000.00 for the purpose of lowering her interest rate and monthly payment. Her property was apparently only worth $67,000.00 at the time of the loan, despite a licensed appraiser valuing the property at $152,000.00. The respondent filed a complaint against the petitioner, the appraiser, and the loan servicer. She settled for $98,000.00 with the appraiser and loan servicer and proceeded to trial against the petitioner on her claims of an "illegal loan" prohibited by West Virginia Code § 31-17-8(m)(8) and fraud; she sought punitive damages and a determination that the statutory violation was "willful" for purposes of voiding the loan. A jury rejected all of the respondent's claims except for a single violation without malice of West Virginia Code § 31-17-8(m)(8). Prior to trial, the petitioner moved the circuit court for judgment as a matter of law on the respondent's claim for a violation of West Virginia Code § 31-17-8(m)(8), which the circuit court erroneously denied.

The majority concludes, as did the circuit court, that this statutory provision prohibits the making of a singular mortgage loan in an amount that exceeds the fair market value of the property. In fact, it does no such thing. West Virginia Code § 31-17-8(m)(8) provides in pertinent part:

In making any primary or subordinate mortgage loan, no licensee may, and no

primary or subordinate mortgage lending transaction may, contain terms which:

(8) Secure a primary or subordinate mortgage loan in a principal amount that, *when added to the aggregate total of the outstanding principal balances of all other primary or subordinate mortgage loans* secured by the same property, exceeds the fair market value of the property on the date that *the latest mortgage loan* is made.

(Emphasis added). Without necessity of interpretation or construction of the statute, even the most casual reader can ascertain that the statute forbids only making a loan (whether primary or subordinate) which "when added to the *aggregate* total ... of *all other* ... loans secured by the same property" exceeds the property's fair market value. (Emphasis added). This clear and simplistic language plainly proscribes making a loan that, *when aggregated with other loans*, exceeds the property's fair market value. The *sine qua non* of this prohibition is the existence of "other primary or subordinate mortgage loans" which aggregate, along with the subject loan, to exceed the property's fair market value. The necessity of the existence of other loans is further made clear by the operative date for the fair market valuation of the property—"the date that the *latest* mortgage loan is made." (Emphasis added).

The rationale behind the mortgage loan prohibition, as stated in the statute, rather than the one created by the majority, is not difficult to discern. Loans which on their face alone do not exceed the property's fair market value, but do so when added to other encumbrances, may deceptively lure a consumer into believing the property adequately collateralizes the individual loan. In reality,

however, such a loan creates potential personal exposure for the consumer because the property has insufficient value to cover the aggregate combined total of the loans, which *aggregated* total may be unknown to or not easily ascertained by the consumer. It is this type of deceptive and predatory practice that the statute seeks to preclude. On the other hand, a singular primary mortgage loan, the value of which exceeds the property's fair market value, would be hard for even the most unsuspecting consumer to overlook. More importantly, such a loan may quite purposefully exceed the property's value in order to provide additional funds for other purposes, such as paying off other unsecured debt. *See McFarland v. Wells Fargo Bank, N. A.*, 810 F.3d 273, 281 (4th Cir. 2016) (noting that excess proceeds of under-collateralized loan provided McFarland "with money he needed to pay off approximately $40,000 of student and automobile debt, as he had hoped.").

The majority, despite declaring West Virginia Code § 31-17-8(m)(8) unambiguous, launches into a lengthy discussion of the rule of statutory *construction* regarding avoidance of absurd results and the Legislative intent behind the statutory scheme to reach its erroneous conclusion that a single, stand-alone loan that exceeds the property's fair market value is prohibited by this statute.[1] Focusing exclusively on the use of the terms "primary or subordinate" mortgage, the majority, like the respondent, grossly oversimplifies the statute, rendering meaningless more than half of the remaining language in the statute. The majority apparently believes this reverse engineering is necessary to reach the immaterial conclusion that the stat-

---

1. As stated within the precedent cited by the majority, ascertaining and giving effect to the intention of the Legislature is the primary rule of "statutory *construction*." Syl. Pt. 1, *Sheena H. For Russell H. v. Amfire, LLC*, 235 W.Va. 132, 772 S.E.2d 317 (2015) (emphasis added). Further, avoidance of absurdity in favor of reasonableness are methods of "*construction* of a statute[.]" Syl. Pt. 3, *Id.* (emphasis added). The majority apparently overlooks the threshold, fundamental principle that "[j]udicial interpretation of a statute is warranted only if the statute is ambiguous[.]" Syl. Pt. 1, in part, *Ohio Cnty Com'n v. Manchin*, 171 W.Va. 552, 301

S.E.2d 183 (1983). Having declared the statute unambiguous, it is unclear why the majority relies upon these canons of statutory construction—there is quite simply nothing to construe. *See* Syl. Pt. 6, *Leggett v, EQT Production Co.*, 239 W.Va. 264, 800 S.E.2d 850, 2017 WL 2333083 (2017) ("'When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute.' Syl. Pt. 5, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959).").

ute "applies" to "primary" or "first" mortgages. Certainly, it does. Depending upon whether the subject loan is a primary or subordinate loan, the statute is potentially applicable.

However, it is the majority's lack of familiarity with lending practices which reveals the fallacy in its logic when it states that "by definition only subordinate mortgage loans are 'subject to the lien of one or more prior recorded mortgages or deeds of trust.'" In short, the majority apparently believes that the only time a "primary mortgage loan" could be effectuated is when no other loans already exist. Quite the contrary, loans which assume the first-lien priority status, i.e., "primary" loans, are commonly entered into when other, "subordinate" loans exist.[2] Through use of a garden-variety subordination agreement, the refinance of a "primary mortgage" preserves the first lien status of the mortgage despite the existence of "prior recorded mortgages or deeds of trust."[3] In this event, the statute could be violated if this "primary" loan was entered into where there are additional "subordinate" loans which, aggregated with the subject primary loan, exceed the property's fair market value as of the date of the "latest" mortgage loan. The reason the statute prohibits such practice—regardless of whether the subject loan is a primary or subordinate loan—is to account for this very scenario, i.e., the refinance of a primary loan, which will continue to occupy first-lien status.[4] The prohibition against this practice as to primary loans does *not* mean that a singular, stand-alone primary mort-

gage that exceeds 100 percent loan-to-value violates the statute.

This is the same conclusion reached by Judge Goodwin in the Southern District of West Virginia—the only jurist to have previously addressed this precise issue. In *Skibbe v. Accredited Home Lenders, Inc.*, No. 2:08-cv-01393, 2014 WL 2117088 *6 (May 21, 2014, S.D. W.Va.), Judge Goodwin similarly reasoned that "the plain language of the statute requires the existence of other mortgage loans before it will apply." I can scarcely improve upon Judge Goodwin's straightforward reading of the plain language of the statute:

> By its terms, the statute does not apply when a borrower takes out her first mortgage loan and the principal balance of that loan exceeds the fair market value of the property at the time the loan is made. This section applies when a borrower takes out an additional mortgage loan, and the principal balance of that loan, when *added* to the outstanding balance of *other existing loans*, "exceeds the fair market value of the property on the date that the latest mortgage loan is made."

*Id.* (Emphasis in original). This conclusion is entirely unaffected by the respondent's string cite of cases, which purportedly conclude that "the statutory prohibition applies to both primary and subordinate mortgage loans." These cases either *did* involve multiple loans (to which the statute plainly applies) or failed altogether to address the issue presented herein: the applicability of the statute to a singular loan that exceeds the property's fair market value.[5] To state that

---

**2.** The statutory definitions provide that the only difference in a primary and subordinate mortgage loan is that the "subordinate mortgage loan" is "subject to the lien of one or more prior recorded mortgages or deeds of trust." W.Va. Code § 31-17-1(m) and (o). "Primary mortgage loan" is *not* defined as a singular loan which exists to the exclusion of all other loans. Rather, it is simply a mortgage loan which occupies first-lien position.

**3.** "A mortgage subordination agreement is a document frequently used when there are two mortgages on a home, and the homeowner is looking to refinance the first mortgage. The mortgage subordination agreement specifies which mortgage takes precedence over the other." http://www.mortgage101.com/article/what-is-mortgage-

subordination-agreement (last visited June 12, 2017).

**4.** Were the statute not to make such a provision for primary loans, a predatory lender could simply refinance the *first-lien* mortgage and obtain subordination of any other loans, thereby duping the debtor into encumbering his or her property for a greater *aggregate* amount than the property is worth—the precise practice prohibited by the statute.

**5.** *Fabian v. Home Loan Center, Inc.*, No. 5:14-cv-42, 2014 WL 1648289 (N.D. W.Va. Apr. 24, 2014), and *Robinson v. Quicken Loans, Inc.*, 988 F.Supp.2d 615 (S.D. W.Va. Dec. 24, 2013), both involved a primary mortgage and a secondary home equity line of credit. *O'Brien v. Quicken*

the statute "applies" to primary or subordinate mortgage loans is to miss the entire issue presented herein.

The majority's reading of West Virginia Code § 31-17-8(m)(8) requires one to completely disregard the primary operative language of the statute, *i.e.*, the aggregation language. In order to give significance to this language, the respondent flimsily suggests that when there is no other such loan(s) with which to aggregate, the "outstanding principal balance" added to the subject loan is simply zero. However, if the Legislature had intended to wholly proscribe loans which, alone *or* in the aggregate, exceed a property's fair market value, it certainly could have done so by simply writing the statute to prohibit a mortgage loan that either singly or "when added to the aggregate total of the outstanding principal balances of all other primary or subordinate mortgage loans, *if any,* secured by the same property, exceeds the fair market value...." The Legislature simply did not so intend.[6] Nor did the Legislature see fit to expand the statute to include single, primary mortgage loans when the statute was amended in 2001, 2002, 2010, 2012, and 2016.

The foregoing leads to the core fallacy underlying the majority's conclusion: there is simply nothing illegal or unlawful about making a loan in excess of a property's fair market value should a lender choose to accept such risk.[7] There is no federal prohibition on such a practice identified by the respondent and such loans create greater risk to the lender than the consumer. In

*McFarland*, 810 F.3d at 278, faced with precisely the same scenario, the Fourth Circuit explained:

> Whatever the pitfalls, receiving too much money from a bank is not what is generally meant by "overly harsh" treatment.... [I]t is not the borrower but the bank that typically is disadvantaged by an under-collateralized loan. That is why borrowers may pay a premium for under- or non-collateralized loans, why it is common practice for banks, as many borrowers can attest, to ensure that their real estate loans are for significantly less than property value, and why a generous mortgage loan is usually cause for celebration and not a lawsuit.

*Id.* at 280 (citations omitted). Further, as Judge Goodwin aptly reasoned in the underlying District Court opinion concerning this scenario:

> The notion that [a consumer is] harmed by [a mortgage loan that exceeds the secured property's fair market value] is ridiculous. Consumers using credit cards to incur more charges than they can repay are not disadvantaged by their high credit limits. Students financing their education are not disadvantaged by their ability to obtain such financing. The plaintiff obviously owes a larger debt than he otherwise would if he accepted a smaller loan. But that is exactly how loans work, and there is nothing unfair about it.

*McFarland v. Wells Fargo Bank, N.A.*, 19 F.Supp.3d 663, 670 (S.D. W.Va. 2014), *aff'd in part, vacated in part*, 810 F.3d 273 (4th

---

*Loans, Inc.*, No. 2:12-cv-5138, 2013 WL 2319248 (S.D. W.Va. May 28, 2013), *Hixson v. HSBC Mortgage Services, Inc.*, No. 09-ap-42, 2011 WL 4625374 (Bankr. N.D. W.Va. Sept. 30, 2011), *Bishop v. Quicken Loans, Inc.*, No. 2:09-cv-1076, 2011 WL 1321360 (S.D. W.Va. Apr. 4, 2011), *Croye v. GreenPoint Mortg. Funding, Inc.*, 740 F.Supp.2d 788 (S.D. W.Va. 2000), and *Quicken Loans, Inc., v. Brown*, 230 W.Va. 306, 737 S.E.2d 640 (2012), were all disposed of on pleading or evidentiary issues or did not otherwise address the issue presented in any fashion. All of these cases, except for *Hixson*, involved the respondent's counsel.

**6.** In fact, before inclusion of these and other provisions into this Article, it was entitled *"Secondary* Mortgage Loans." *See* W.Va. Code Chap-

ter 31, Article 17 (1996). In 2000, subsection (m)(8) was added to West Virginia Code § 31-17-8 and the statute was amended to govern mortgages, generally, removing references to "secondary" mortgage loans and altering the title to simply "Mortgage Loans." However, the particular portion of West Virginia Code § 31-17-8(m)(8) at issue herein has remained unaltered since its inclusion in 2000, and has always forbidden primary or subordinate mortgages *insofar as* such mortgages aggregated with other outstanding loans exceeds fair market value.

**7.** This would be subject, of course, to any and all applicable state and federal lending guidelines in the making and consummation of the loan. *See* 15 U.S.C.A. § 1601 *et seq.* (governing "Consumer Credit Cost Disclosures").

Cir. 2016). In fact, the Fourth Circuit fully embraced Judge Goodwin's cogent analysis that "[i]f anything ... an undersecured mortgage disadvantages the lender, not the borrower" when affirming Judge Goodwin's conclusion that such a loan is not, on its terms alone, substantively unconscionable.[8]

The foregoing is utilized not necessarily as dispositive of the meaning of the statute at issue, but as an illustration that loans that exceed a property's fair market value are neither unheard of nor inherently suspect. In fact, under the federal "Home Affordable Refinance Program"[9] such loans are often written by lenders with no loan-to-value ratio ("LTV") requirements.[10] *See* http:// harpprogram.org/faq.php ("There is no longer a maximum LTV limit for borrower eligibility. If the borrower refinances under HARP® and their new loan has a fixed rate mortgage, there is no maximum LTV. If the borrower refinances under HARP® and their new loan is an adjustable rate mortgage, their LTV may not be over 105%."). While such loans are expressly exempted from the reach of West Virginia Code § 31-17-8(m)(8), their mere existence demonstrates that the practice now made unlawful by the majority is, if perhaps not commonplace, perfectly legitimate. As Judge Goodwin astutely noted, "[f]ollowing the plaintiff's logic, all unsecured loans are substantively unconscionable[.]" *McFarland*, 19 F.Supp.3d at 670. Just as unsecured loans are not *per se* unconscionable, singular loans that exceed 100% loan-to-value are not unlawful. As such, there is simply no reason why the Legisla-

ture would have chosen to forbid under-secured loans in a statutory scheme designed to prohibit *predatory* lending practices. *See Herrod v. First Republic Mortg. Corp.*, 218 W.Va. 611, 618, 625 S.E.2d 373, 380 (2005) (describing W.Va. Code § 31-17-8(m) as part of West Virginia's "predatory lending law").

In short, the majority has ham-handedly rendered a perfectly lawful lending transaction "predatory" in nature and, therefore, "illegal." For those of us not immersed in the industry, it is difficult to predict the sweeping implications of the majority's uninformed decision. What is clear, however, is that it is now incumbent upon the Legislature to rectify this "judicial legislation" and cure any economic implications created by the unwary majority, which was apparently bent on salvaging the respondent's self-proclaimed "victory" that was only marginally obtained in the first instance.

## II. *Erroneous Attorney's Fee Award*

The respondent's self-proclaimed "victory" leads me to the majority's second, equally inscrutable and erroneous conclusion: that the respondent somehow "prevailed" in the underlying litigation, making her entitled to a potential award of more than $150,000.00 in attorney's fees, despite securing not a single penny in judgment from the petitioner for its alleged statutory violation. As indicated above, the jury awarded the respondent $27,000.00 in damages for the petitioner's

---

**8.** Interestingly, despite being represented by the same counsel as the respondent herein—Mountain State Justice—and presenting ostensibly identical facts involving only a singular, undercollateralized loan, McFarland did not bring an action for violation of West Virginia Code § 31-17-8(m)(8). Rather, he only asserted claims for substantive unconscionability and unconscionable inducement; the Fourth Circuit allowed only the claim of unconscionable inducement to proceed. The respondent in the case at bar voluntarily dismissed her claim of unconscionable inducement.

**9.** *See Marks v. Bank of Am., N.A.*, No. 03:10-CV08039PHXJAT, 2010 WL 2572988, at *5 (D. Ariz. June 22, 2010) ("On October 8, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008, Pub.L. No. 110-343, 122 Stat. 3765 (codified 12 U.S.C.A. § 5201

et seq.) ("EESA"). Section 109 required the Secretary of the Treasury ("the Secretary") to take certain measures in order to encourage and facilitate loan modifications. 12 U.S.C.A. § 5219.... The EESA authorized the Secretary of the Treasury, FHFA, Fannie Mae, and Freddie Mac to create the Making Home Affordable Program on February 18, 2009, which consists of two components: (1) the Home Affordable Refinance Program ["HARP"], and (2) the HAMP ["Home Affordable Modification Program"].").

**10.** *See* http://harp.gov/About ("Introduced in March 2009, HARP enables borrowers with little or no equity to refinance into more affordable mortgages without new or additional mortgage insurance. HARP targets borrowers with loan-to-value (LTV) ratios equal to or greater than 80 percent and who have limited delinquencies over the 12 months prior to refinancing.").

non-willful statutory violation. Having previously settled with the other co-defendants in the total amount of $98,000.00 ($65,500.00 in compensatory damages and $32,500.00 for attorney's fees), after offset, the respondent received nothing from the petitioner. This perceived "moral victory" is wholly insufficient to substantiate an award of attorney's fees. In rejecting the same argument, the United States Supreme Court stated:

> The only "relief" [plaintiff] received was the moral satisfaction of knowing that a [ ] court concluded that his rights had been violated. The same moral satisfaction presumably results from any favorable statement of law in an otherwise unfavorable opinion. .... [A] favorable judicial statement of law in the course of litigation ... does not suffice to render him a "prevailing party." Any other result strains both the statutory language and common sense.

*Hewitt v. Helms*, 482 U.S. 755, 762-63, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).

### A. *The respondent did not "prevail"*

The United States Supreme Court has further explained that "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation *which achieves some of the benefit the parties sought in bringing suit.*" *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (citing *Nadeau v. Helgemoe*, 581 F.2d 275, 278-79 (1st Cir. 1978) (emphasis added)). The respondent can identify absolutely no "benefit" the trial and jury verdict rendered. Similarly, this Court has held that "[f]or a plaintiff to have 'prevailed' at trial, ... he must demonstrate that the litigation effected the material alteration of the legal relationship of the parties in a manner which the legislature sought to promote in the fee statute." *Schartiger v. Land Use Corp.*, 187 W.Va. 612, 613, 420 S.E.2d 883, 884 (1991). The respondent's "victory" of a mere finding of a single, non-willful statutory violation resulted in absolutely no alteration of the legal relationship of the parties: the petitioner paid the respondent nothing and the debt remained intact due to the finding of a non-willful violation. More to the point, this Court has expressly stated:

> A party who needlessly pursues litigation after he has been offered a settlement that exceeds what the jury finally awards by an amount sufficient to have compensated the plaintiff for all his attorneys' fees and expenses at the time the offer was made is not entitled to any attorneys' fees that accrued after the offer was made.

*Id.* at 616, 420 S.E.2d at 887. This is precisely what occurred in this case. As indicated in the petitioner's brief, months before trial it extended a settlement offer to the respondent, which she rejected. The respondent then "needlessly pursue[d] litigation" and gained nothing. *Id.*

The majority appears to be implicitly operating under a misapprehension that the pre-offset verdict is of some legal consequence in this analysis. Let me be clear: the offset in this matter was not levied as a "favor" to the petitioner, nor is it a mere technicality which creates the illusion that the respondent did not prevail. An offset for amounts already paid by jointly tortious defendants is legally required and serves to fix, by law, the amount which the respondent is legally entitled to recover from the petitioner. Indeed, "[d]efendants in a civil action against whom a verdict is rendered are entitled to have the verdict reduced by the amount of any good faith settlements previously made with the plaintiff by other jointly liable parties." Syl. Pt. 7, *Bd. of Educ. of McDowell Cty. v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 600, 390 S.E.2d 796, 799 (1990). In this case, the respondent is entitled to recover *nothing* by operation of law. Until the offset is applied, the judgment is neither fixed, nor final. *See Groves v. Compton*, 167 W.Va. 873, 880, 280 S.E.2d 708, 712 (1981) (stating that when jury is not apprised of prior settlement amount "the trial court deducts the settlement figure from the award *before entering the judgment*") (emphasis added). Therefore, focus on the pre-offset verdict of $27,000.00 is pointless.

Accordingly, the final appealable judgment entered in this matter was *zero*.[11] The judg-

---

11. The circuit court granted the petitioner's motion to correct the verdict to reflect an offset of $65,500.00, leaving a verdict of zero.

ment is precisely the same as if the jury had found no violation or a violation, yet no damages. Other courts have had little difficulty in reaching the inescapable conclusion that somehow eludes the majority: that the trial and verdict must have benefitted the respondent in some manner for her to have "prevailed." *See Goodman v. Lozano*, 47 Cal.4th 1327, 104 Cal.Rptr.3d 219, 223 P.3d 77, 78 (2010) (finding plaintiff "ordered to take nothing against the nonsettling defendants due to the settlement offset" was not prevailing party); *Imperial Lofts, Ltd. v. Imperial Woodworks, Inc.*, 245 S.W.3d 1, 7 (Tex. Ct. App. 2007) (holding that because "settlement credits and insurance payment exceeded the jury's damage award ... [plaintiff] was not the prevailing party and was not entitled to recover its attorney's fees."); *Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 806 (Tex. Ct. App. 1988) ("It is one thing to allow a party an award of attorney fees on a successful claim notwithstanding an opposing party's success on an offsetting claim. It is quite another to allow attorney fees on a claim which, although successful, was paid in full [through prior settlements] before trial."); *Stout v. State*, 60 Wash.App. 527, 803 P.2d 1352, 1354 (1991) (holding "one who obtains a verdict for an amount equal to or less than what is already in hand has not received an affirmative judgment and is not the prevailing party" for purposes of attorney's fee award).

In absence of damages—a necessary element of any cause of action—what has the respondent successfully accomplished? The respondent did not seek a mere declaration that the petitioner violated West Virginia Code § 31-17-8(m)(8). She proceeded to trial under the belief that her action against the petitioner would garner her a damages award in excess of those amounts she had already received; she was wrong. Under the respondent's argument, the only party who benefitted from that erroneous risk assessment is her attorney. Quite simply, West Virginia Code § 31-17-8 does not exist to generate fees for lawyers. Under the majority's decision, there is no disincentive for attorneys to encourage their clients to endure the rigors of trial since, at worst, their client recovers nothing, yet they still recover their

fees. This transforms the statute into a mere fee-generating mechanism for attorneys.

### B. Attorney's fees under West Virginia Code § 31-17-17 are not compensatory

I further take extreme issue with the circular position that, since attorney's fees were recoverable under the statute, such fees therefore form part of the compensatory damages to which the respondent was entitled, thereby justifying an award of attorney fees. Boiled to its essence, the respondent argues that the statutory allowance for attorney's fees supports the notion that she "prevailed"; since she prevailed, she is thereby entitled her to attorney's fees. Aside from being entirely circular, this argument contains a more obvious fallacy: that she is necessarily "entitled" to attorney's fees under the statute.

As set forth in my dissent in *Quicken Loans, Inc. v. Brown*, 236 W.Va. 12, 777 S.E.2d 581 (2014) ("*Quicken II*"), attorney's fees and costs are not *per se* compensatory damages, the type to which a claimant is entitled. Although the discussion in *Quicken II* regarded recovery of attorney's fees under the West Virginia Consumer Credit and Protection Act, the analysis is the same. Like the Consumer Credit and Protection Act, West Virginia Code § 31-17-17(c) makes fees *permissible*, not mandatory: "Any residential mortgage loan transaction in violation of this article shall be subject to an action ... by the borrower *seeking* damages, reasonable attorney's fees and costs[.]" While a borrower may "seek" attorney's fees, there is no language whatsoever in the operative statute making an award of fees mandatory under any circumstances. As I explained in *Quicken II*, "[l]ogic suggests that recovery of [attorney's fees] would have been structured as mandatory if the Legislature had intended attorney's fees and costs to be deemed compensatory in nature[.]" *Id.* at 46, 777 S.E.2d at 615 (Loughry, J., dissenting). Moreover, a separate delineation of attorney's fees and costs, in addition to "damages," further suggests that such an award does not represent part of the recovery needed to compensate a plaintiff. Finally, the type of predatory lending behavior West Virginia Code § 31-17-8

seeks to preclude is clearly "bad behavior"; the purpose for which attorney's fees are awarded for such behavior is to "punish[ ] and discourage." *Boyd v. Goffoli*, 216 W.Va. 552, 569, 608 S.E.2d 169, 186 (2004). Thus, it makes little sense to argue that the *availability* of attorney's fees, if appropriate, constitutes some sort of compensatory element of the respondent's damages which itself is sufficient to *justify* an award of attorney's fees. I therefore find the majority's new syllabus point declaring these permissive fees to be compensatory wholly without support.

### C. *The circuit court's attorney's fee analysis was error*

Assuming, *arguendo*, that the respondent's "moral victory" against the petitioner made her the "prevailing" party for purposes of an attorney's fee award, it is clear that the circuit court erred in summarily awarding fees generated prosecuting the entire cause of action against all defendants and only allowing an offset of a nominal, non-representative figure for attorney's fees received in the prior settlements. It is well-established that "when a complainant sets forth distinct causes of action so that the facts supporting one are entirely different from the facts supporting another, and then fails to prevail on one or more such distinct causes of action ... attorneys' fees for the unsuccessful causes of action should not be awarded." *Bishop Coal Co. v. Salyers*, 181 W.Va. 71, 83, 380 S.E.2d 238, 250 (1989). The figure presented by the respondent to the circuit court reflected fees generated in pursuit of the *entire* case against *all* defendants, as reflected in the circuit court's order. Further, the figure requested by the respondent plainly represented efforts expended in pursuing its *entire* case against the petitioner, including her fraud claim on which she did not prevail. Any fee award should have consisted only of those fees and costs generated in pursuit of the respondent's singular "successful" claim against the petitioner: the nominal statutory violation.

The circuit court attempted to ameliorate the obvious inequity of the significant fee award by offsetting those amounts received from the settling co-defendants that were designated as "attorney's fees" within those settlements. However, the round figures which purportedly represented attorney's fees in the prior settlements—$25,000.00 and $7,500.00—signify literally nothing. There is no evidence those amounts represented actual fees incurred and attributable to the claims against those parties. As settlement figures, they reflected compromised amounts rather than a precise calculation of fees and costs payable by that particular party in settlement of a claim for attorney's fees. Moreover, the circuit court summarily designated certain amounts to pursuit of claims against the settling defendants and concluded that, since such amounts were less than the actual settlement amounts, the respondent was getting some added benefit from offsetting the attorney's fee settlement sums. Significantly, however, since the circuit court's order contains no itemization of these fees and costs, it evades this Court's review. Further, the fact that the circuit court found that time dedicated to pursuing the settling defendants was actually *less* than they paid in settlement for those fees fully demonstrates how arbitrary and unmeaningful the offset truly is.

The flaws in the circuit court's analysis of the attorney's fee award are patent. Rather than clumsily retrofitting the settlement amounts to the clearly over-inclusive fee submission by the respondent, the circuit court, on remand, should dredge out of the fee statements only those amounts reasonably attributable to prosecution of the singular statutory violation upon which the respondent received a favorable result. As indicated above, this is required by our caselaw. The circuit court should then itemize those entries in its order making appellate review of such award feasible. In absence of this methodology, the attorney's fee award is a wholly arbitrary and unreviewable, such that the award that should not stand.

### III. *Conclusion*

The majority's wholly misguided handling of this marginal verdict, both substantively and with respect to the fee award, is not only troubling, but has serious and far-reaching implications that will clearly re-

quire legislative correction. Further, the majority's decision virtually demands that this Court thoroughly revisit its attorney's fee award precedent, particularly that articulated in *Quicken Loans I and II*, rather than simply tossing in a new syllabus point on the issue while remanding for a badly mishandled fee award. Accordingly, I respectfully dissent.

### Justice Ketchum, dissenting

I dissent because the statute under which Quicken Loans was found liable, West Virginia Code § 31-17-8m(8), does not apply to this case.

West Virginia Code § 31-17-8m(8) provides, in pertinent part:

> In making any primary or subordinate mortgage loan, a licensee may not, and a primary or subordinate mortgage lending transaction may not, contains terms which:
>
> . . .
>
> (8) Secure a primary or subordinate mortgage loan in a principal amount that, *when added to the aggregate total of the outstanding balances of all other primary or subordinate loans* secured by the same property, exceeds the fair market value of the property on the date that the latest mortgage loan is made.[1]

By its plain terms, this statute pertains to *additional* mortgage loans, which when *added to all other primary or subordinate loans* secured by the same property, exceeds the fair market value of that property. Clearly, the existence of other mortgage loans is required for Section 31-17-8(m)(8) to apply.

My position is supported by the well-reasoned opinion by Judge Joseph R. Goodwin writing for the Southern District of West Virginia, which perceptively recognized: "By its terms, the statute does not apply when a borrower takes out her first mortgage loan and the principal balance of that loan exceeds the fair market value of the property[.]"[2]

Here, Ms. Walters refinanced her home through Quicken Loans, the result of which was a decrease in her interest rate and monthly mortgage payment. Once the loan was completed, it was the only mortgage loan secured by her home. Because there were not multiple mortgages secured by Ms. Walters' home, West Virginia Code § 31-17-8(m)(8) provides her no relief as a matter of law. The circuit court erred by finding otherwise.

I dissent.

---

1. (Emphasis added).

2. *Skibbe v. Accredited Home Lenders Inc.*, 2014 WL 2117088 at 6 (S.D.W.Va. 2014).